Filed 11/17/15  In re M.C. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| In re M.C., a Person Coming Under the Juvenile Court Law. | C076793 |
| BUTTE COUNTY DEPARTMENT OF EMPLOYMENT AND SOCIAL SERVICES. Plaintiff and Respondent, v. H.C., Defendant and Appellant. | (Super. Ct. No. J37043) |

Mother appeals from the order of the juvenile court denying her reunification services with M.C.  (Welf. & Inst. Code, § 361.5, subd. (b)(10) & (11).)[1]  Mother contends the order bypassing services is not supported by substantial evidence.  We disagree and will affirm the juvenile court's order.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

# I. FACTUAL AND PROCEDURAL BACKGROUND

## A. *The Dependency Petition*

Mother gave birth to the minor in February 2014. Three days after his birth, while mother and the minor were still in the hospital, Butte County Department of Employment and Social Services, Children's Services Division (department) filed a dependency petition alleging the newborn minor came within section 300, subdivisions (b) and (j), for a number of reasons: Mother had a history of substance abuse, chronic homelessness, and mental illness that hindered her ability to provide proper care to the minor; mother was unable to properly care for the minor, having been observed by medical staff to be force feeding the minor, falling asleep with the minor in her arms, handling the minor roughly, and refusing to take direction from hospital staff. Further, father failed to demonstrate an ability to recognize risks to the minor and failed to participate in child care or educational opportunities provided by the hospital. Both mother and father were homeless and unable to provide the minor with adequate food, clothing, and shelter.[2]

The petition alleged the minor's half-sibling, J.R., had previously been removed from mother's care and declared a dependent of the juvenile court due to mother's substance abuse. In that proceeding, reunification services were provided but later terminated due to mother's failure to comply. Mother's parental rights as to J.R. were terminated on January 7, 2014.

## B. *The Request for Protective Custody*

In conjunction with the petition, the department filed a request for protective custody of the minor (§ 340) stating the minor's home environment posed an imminent threat to the minor's health and safety based on mother's behaviors. The behaviors identified in the request included falling asleep with the minor in her arms, force-feeding

---

[2] Father is not a party to this appeal and will be mentioned only when relevant to the discussion.

the minor, not practicing good hygiene while caring for the minor, failing to engage in treatment to address documented mental health issues, refusing to allow placement of the minor in the nursery while mother sleeps, and short-term memory problems, which impacted mother's ability to recall conversations with and directions provided by hospital staff.

The request stated that during the social worker's interview of mother and father in the hospital room, mother "nodded off on approximately ten occasions while talking with [the social worker]" and nearly smashed the minor's head with her arm. When admonished, mother denied being asleep or having done anything wrong, and father did not notice mother's lapse of consciousness or offer assistance with the minor. Mother and father both resided at Torres Shelter and were on the waiting list for the Esplanade House. Both parents were unemployed and receiving minimal monthly food stamps. Father did side jobs "under the table." Mother applied for social security but had yet to be approved. Mother also received assistance from the Women, Infant and Children Program. Both parents had Medi-Cal. With regard to mental health treatment, mother stated she was "keeping calm and staying away from those people who take her there," but was not under the care of a treatment provider because she could not afford bus tickets to obtain treatment. The social worker noted that, while in court-ordered reunification for J.R., mother was provided with bus passes on a monthly basis until October 2013.

The request indicated the social worker completed a safety plan with mother and father which instructed them to follow all directions from medical staff, remove the minor from mother's bed while mother was sleeping and medicated, remain in the hospital until discharged by a doctor, drug test when requested, engage in supportive services, practice better hygiene, and remove outer jackets after smoking before handling the minor. Both parents agreed to and signed the safety plan.

3

With respect to services provided to mother related to J.R.'s dependency proceedings, the request noted that, at the time of J.R.'s detention, mother struggled with substance abuse and mental health issues and had fallen asleep on public transit with then one year-old J.R. in her arms, nearly dropping him more than once. As a result, mother was arrested and charged with being under the influence of a controlled substance and willful cruelty to a child. The court sustained the petition in that case and ordered mother into a plan of reunification. However, mother struggled to fully engage in services provided to her and continued to struggle with the issues that brought J.R. to the court's attention. For instance, of the 26 required drug tests, mother tested only 14 times, albeit testing negative for all substances. She entered the Progress House Residential Treatment on June 19, 2013, but was terminated from that program sometime between August 20, 2013, and August 22, 2013. She also failed to make herself available to the department. As a result, the court terminated reunification services and, on January 7, 2014, terminated her parental rights and ordered a permanent plan of adoption for J.R.

Finally, the request stated the minor was "at a very high risk of harm and neglect" because, while in court-ordered services related to J.R., mother was unable to obtain a stable living environment or source of income, continually struggled with homelessness, showed an inability to adequately care for her child's physical and emotional needs, was unable to understand basic life-skill concepts, was easily frustrated, had diminished ability to effectively communicate, and was unable to stay sober for any length of time. Because mother demonstrated she was unable to adequately care for, nurture, or protect J.R. and had not addressed the issues related to that dependency, and because father was defensive and unable to discern between real and perceived risk to the minor, the department requested that the minor be placed into protective custody.

Finding the minor's environment posed an imminent threat to his health and safety and that he was in imminent danger of abuse, the court granted the request and ordered that the minor be placed in protective custody.

4

## C. The Jurisdiction Hearing

At the jurisdiction hearing, the petition was amended by interlineations, primarily for the purpose of reflecting the parents' denial of the allegations. After mother and father signed a waiver of rights, the juvenile court found the allegations in the amended petition true, sustained the petition, ordered reasonable visitation, and set the matter for a disposition hearing.

## D. Disposition Report and Contested Hearing

The disposition report recommended denial of reunification services to mother pursuant to section 361.5, subdivision (b)(10) and (11), reiterating the information contained in the request for protective custody as support for the recommendation. According to the report, mother was 18 years old when she delivered her first child, who was stillborn. In 2002, mother had her second child, who died one month later. Mother's third child, born in 2005, was placed in foster care in Georgia and likely adopted. Mother's fourth child, born in 2006, was living with his father in Idaho. Mother's fifth child, J.R., was born in 2011 and placed in foster care in November 2012. Mother's parental rights to J.R. were terminated in January 2014.

The report stated that mother began using alcohol and marijuana at the age of 18. Although she told social workers she last used alcohol five years prior and marijuana one year prior, she admitted having an alcohol and drug problem and said she was in recovery. She had received mental health services but was not currently taking medication. During weekly visitation with the minor, mother handled the minor "very roughly," moved him frequently, and sat him up on her chest without supporting his head. Mother had been referred to various services, including safety organized practice meetings, alcohol and drug assessment, parent support groups, and random drug testing and out-patient drug treatment through Stepping Stones. It was recommended she regularly attend weekly community support groups such as 12-step meetings. The report noted that mother had received these same services for her previous child, J.R., from

5

November 2012 through June 2013, but services were terminated on September 10, 2013, and her parental rights as to J.R. were terminated on January 7, 2014. Thereafter, mother failed to make reasonable efforts to treat the problems that led to removal of the minor, or to demonstrate an ability to provide a safe and stable environment for the minor. Medical records attached to the report included a notation that the minor tested positive for opiates at birth.

At the contested disposition hearing on June 12, 2014, the social worker testified that mother was participating in Stepping Stones and Nurturing Parenting, but attended "very few" community-based service meetings as required by Stepping Stones. Mother completed a parent support group, was drug testing negative, and had recently begun taking Zyprexa. Visits between mother and the minor were increased from one and one-half hours three times per week, to two hours three times per week so that mother could bond with the minor. Mother was having difficulty with consistent attendance at Stepping Stones, but had improved over the last month.

With regard to the basis for the recommendation to bypass reunification services, the social worker testified that the minor's half-sibling, J.R., was initially detained because mother was using drugs and falling asleep on the bus, placing J.R. in danger. Thereafter, minor tested positive for drugs at birth. The social worker did not believe mother was capable of taking care of the minor based on mother's visits with the minor, the way she handled the minor, and the fact that she had six children and had "not raised them." She noted mother was "very forgetful and has a hard time focusing on two things at once."

The social worker also noted mother "has not made reasonable efforts to treat her mental illness, unstable living situation, and drug abuse issues" because mother had only recently begun taking medication and seeing a doctor and was slow to follow through with Stepping Stones, although her attendance had improved over the previous month. Mother was also not attending the recommended three or more Alcoholics Anonymous

6

(AA) or Narcotics Anonymous (NA) meetings per week. While mother was engaged in weekly visitation with the minor, the social worker observed her holding the minor without supporting his head, moving him quickly, and focusing on others in the room instead of the minor.

At the time the minor was removed from mother's care, mother was not pursuing treatment from a mental health care provider, not taking medication for her mental health needs, did not have stable housing, and was not clean and sober. At the time of the disposition hearing, mother was temporarily staying in the living room of the home of her brother (who was using pills and smoking marijuana) and had recently made an appointment with a mental health doctor and begun taking medication. Although mother began treatment at the Progress House while pregnant with the minor, a drug treatment program for pregnant women and new mothers, she was terminated within a month or two. She had not since reported being in a treatment program.

Mother made an offer of proof that, among other things: she had been regularly attending all visits with the minor, had never been told that she was handling the minor roughly or been given any direction on how to handle him differently, completed the parent support group and had been attending Stepping Stones regularly since March 17, 2014, had recently learned how to use her phone to schedule appointments and reminders, had been regularly attending meetings two to three times per week and sharing her log sheets with the social worker and her counselor at Stepping Stones. Further, she had drug tested as requested and tested clean each time, missing only one test because she forgot her I.D., had applied for and was denied Social Security and was awaiting a decision on her appeal, attempted to access Far Northern Regional Center to obtain services and was awaiting a return telephone call, had been staying at the Torres Shelter for the past six months, where she drug tested regularly and tested clean each time, was working on obtaining housing, and was being treated by a doctor for depression and

7

anxiety and had been prescribed Zyprexa, which she had been taking for approximately one and one-half months.

Mother also made an offer of proof that when J.R. was removed and she was arrested for being under the influence of prescription drugs, she was taking two medications prescribed by her doctor which caused extreme drowsiness. Similarly, when she delivered the minor by C-section, the hospital provided her with opiates for pain. Prior to the minor's birth, she had also been prescribed cough medicine. Mother was on the waiting list for Esplanade House and would do "anything and everything asked" of her to reunify with the minor.

Mother testified that she was diagnosed with bipolar and schizophrenia by a doctor in Idaho in 2005 or 2006, and that, recently, she was doing much better since taking the medication for approximately two months. In addition, she was attending Stepping Stones twice a week.

The juvenile court found that mother made recent efforts to obtain medication for her mental health issues, completed parent support group, had better attendance at Stepping Stones, and tested clean despite having a history of methamphetamine use and an addiction to prescription pills. However, while mother received treatment for her mental health issues from 2005 to 2006, she then attempted to "treat herself and do her own remedy by not taking medication any further for a number of years," and only recently sought treatment through Far Northern Regional Center.

Noting the young age of the minor, the court found the minor was stable in placement and, while mother had stability for herself at the Torres Shelter, her current location (her brother's house) was not suitable for a child, given her brother's drug use and the fact that mother was staying in the living room of the home.

The court found the problems facing mother were serious and long-term, noting that her ongoing drug use dated back to her teenage years and her mental health issues were diagnosed in 2005 or 2006. Mother was unable to maintain custody of her other

three children and lacked parenting skills, as evidenced by her "somewhat slow response . . . to prepare herself for reunification" with the minor, despite losing custody of her other children; one of whom required intervention by the department, and a second who required intervention by children services in Georgia.

The court also found that, while visits between mother and the minor had been consistent, there was a question whether their interaction was safe for the minor and thus it was difficult to determine the extent, if any, of the bond between them. The court commended mother for attending visits on a regular basis and balancing visitation with her participation at Stepping Stones, but noted mother reportedly handled the minor in a rough manner just as she had reportedly handled J.R. in the prior dependency case; demonstrating mother's failure to develop her parenting skills in that regard.

The court also noted mother had only recently responded to the mental health problems that contributed to termination of reunification services regarding J.R., and that her issues regarding housing remained unresolved. While finding mother's recent efforts to address certain issues appeared to be "genuine and substantial," the court was concerned with mother's ability to sustain mental health treatment, her lack of housing and income, and her ability to provide a stable environment for the minor; and was not convinced there was a reasonable likelihood of successful reunification if services were provided to her.

The court concluded mother had not met her burden of showing, by clear and convincing evidence, that reunification would be in the minor's best interest. In doing so, the court adopted the findings and recommendations in the dispositional hearing order, including that the minor "shall be removed" from the physical custody of mother and father, that reasonable efforts had been made to prevent the need for removal, and that mother had not made sufficient progress with the case plan to alleviate the minor's removal. In so concluding, the court noted mother's recent progress was fair in

9

complying with random drug testing, but she was nonetheless slow to start services and lacked stable housing or a suitable source of income to care for the minor.

## II. DISCUSSION

Mother contends the court's bypass order was not supported by substantial evidence of her failure to make reasonable efforts to treat the problems that led to the removal of the minor's sibling, J.R. As we shall explain, we find her claim to be without merit.

When a child is removed from the parent's home, reunification services may be offered to the parent, " 'in an effort to eliminate the conditions leading to loss of custody and facilitate reunification of parent and child. This furthers the goal of preservation of family, whenever possible. [Citation.]' [Citations.] Section 361.5, subdivision (b) sets forth certain exceptions — also called reunification bypass provisions — to this 'general mandate of providing reunification services.' [Citations.]" (*In re Allison J.* (2010) 190 Cal.App.4th 1106, 1112.) "When the court determines a bypass provision applies, the general rule favoring reunification is replaced with a legislative presumption that reunification services would be ' "an unwise use of governmental resources." ' [Citations.]" (*Ibid.*)

Section 361.5, subdivision (b)(10) provides that reunification services need not be provided to a parent when the court finds, by clear and convincing evidence, that the court has previously "ordered termination of reunification services for any siblings or half siblings of the child because the parent . . . failed to reunify with the sibling or half sibling after the sibling or half sibling had been removed from that parent . . . pursuant to Section 361 and that parent . . . is the same parent . . . described in subdivision (a) and that, according to the findings of the court, this parent . . . has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from that parent."

10

Similarly, section 361.5, subdivision (b)(11) provides that the parent need not be provided with reunification services when the court finds clear and convincing evidence that "the parental rights of a parent over any sibling or half sibling of the child had been permanently severed, and this parent is the same parent described in subdivision (a), and that, according to the findings of the court, this parent has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from the parent."

The reasonable effort requirement of section 361.5, subdivision (b)(10) and (11) "focuses on the extent of a parent's efforts, not whether he or she has attained 'a certain level of progress.' [Citation.] 'To be reasonable, the parent's efforts must be more than "lackadaisical or half-hearted." ' [Citations.] However, '[t]he "reasonable effort to treat" standard "is not synonymous with 'cure.' " ' [Citation.]

"We do not read the 'reasonable effort' language in the bypass provisions to mean that *any* effort by a parent, even if clearly genuine, to address the problems leading to removal will constitute a reasonable effort and as such render these provisions inapplicable. It is certainly appropriate for the juvenile court to consider the *duration, extent and context* of the parent's efforts, as well as any other factors relating to the *quality and quantity* of those efforts, when evaluating the effort for reasonableness. And while the degree of progress is not the *focus* of the inquiry, a parent's progress, or lack of progress, both in the short and long term, may be considered to the extent it bears on the *reasonableness* of the effort made.

"Simply stated, although success alone is not the sole *measure* of reasonableness, the measure of success achieved is properly considered a factor in the juvenile court's determination of whether an effort qualifies as reasonable." (*R.T. v. Superior Court,* (2012) 202 Cal.App.4th 908, 914-915.)

We review an order denying reunification services for substantial evidence. (*R.T. v. Superior Court, supra,* 202 Cal.App.4th at p. 914.)

11

Here, there is substantial evidence to support the juvenile court's finding that mother failed to make reasonable efforts to treat the problems that led to removal of the minor's half-sibling, J.R. As set forth in the petition, the request for protective custody, and the disposition report, J.R. was removed after mother, who was then struggling with substance abuse and mental health issues, was arrested and charged with being under the influence of a controlled substance and willful cruelty to a child. As reported by a bystander, mother had fallen asleep on public transit with J.R. (just one year old at the time) in her arms and nearly dropped him more than once. The dependency petition in that case was filed on November 7, 2012, and a plan of reunification ordered on December 27, 2012.

Mother was ordered to participate in reunification services as to J.R., but struggled to do so. She was requested to drug test 26 times and, while she tested negative for all substances 14 times, she failed to appear for the remaining 12 drug tests. She entered a residential treatment program on June 19, 2013, but was terminated from that program just two months later and failed to make herself available to the department.

The court terminated reunification services as to J.R. on September 10, 2013, and, on January 7, 2014, terminated mother's parental rights and ordered a permanent plan of adoption. According to the disposition report authored on April 1, 2014, mother admitted she had a long-term alcohol and drug problem and had not been taking medication for her mental health issues.

Regarding the recommendation to bypass reunification service, the social worker testified that the minor's half-sibling, J.R., was initially detained because he was endangered by mother's use of drugs. The minor tested positive for drugs at birth; just five months after reunification services were terminated, and one month after parental rights were terminated in J.R.'s dependency proceeding. The social worker further testified that mother had "not made reasonable efforts to treat her mental illness, unstable living situation, and drug abuse issues" because mother had only recently begun taking

12

medication and seeing a doctor and was slow to follow through with Stepping Stones, although her attendance had improved over the previous month. The social worker was also troubled by the fact that mother was not attending the recommended three or more AA or NA meetings per week and, during weekly visitation, continued to hold the minor without supporting his head, moved him quickly, and focused on others in the room instead of the minor.

At the time of J.R.'s removal in November 2012, mother was not pursuing treatment from a mental health care provider, not taking medication necessary to address her mental health needs, did not have stable housing, and was not clean and sober. By the time of the disposition hearing regarding the minor in June 2014, mother was staying in her brother's living room, despite her brother using pills and smoking marijuana. She had only recently made an appointment with a mental health doctor and begun taking medication for her mental health issues. While pregnant with the minor, she was terminated from the drug treatment program at the Progress House after being there for only a month or two. Since being terminated, she had not entered a different treatment program.

As the juvenile court noted, mother's efforts to acquire medication for her mental health issues, complete Parent Support Group, improve attendance at Stepping Stone, regularly attend weekly visits with the minor, and provide clean drug tests, were commendable but only recent. Mother's housing, although somewhat stable for her, was still not suitable for the minor, and mother continued to handle the minor "in a very rough manner." Given these factors, the likelihood of successful reunification was low.

Mother claims there is scant evidence in the record regarding the nature of the problems leading to removal of J.R., and no information regarding which subdivision of section 300 the juvenile court applied in that removal. She further claims that, because the juvenile court here never took judicial notice of J.R.'s dependency file, evidence in

13

J.R.'s case was not before the court here except to the extent it was included in the petition, the reports, and the testimony at the contested disposition hearing.

The fact that J.R.'s dependency record was not made a part of these proceedings is not determinative. The dependency petition in the minor's case contained allegations regarding the problems that led to J.R.'s removal, as well as the termination of mother's reunification services and parental rights as to J.R. Despite mother's denial of those allegations, the juvenile court sustained the petition.

Evidence submitted at the contested disposition hearing in support of the denial of reunification services included the disposition report and the testimony of the social worker. To the extent mother is challenging the admissibility of that evidence on appeal, her claim is forfeited for failure to object below. (Evid. Code, § 353, subd. (a).) In any event, we note that hearsay statements in a social study report are generally admissible in dependency proceedings. (§ 281; *In re Keyonie R.* (1996) 42 Cal.App.4th 1569, 1571-1573.) As for the testimony of the social worker, it is the juvenile court's role to assess the credibility of the witnesses and to weigh the evidence to resolve conflicts in the evidence. It is not within our purview as an appellate court "to judge the effect or value of the evidence, to [re]weigh the evidence, to consider the credibility of witnesses or to resolve conflicts in the evidence." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52-53; accord *In re James R.* (2009) 176 Cal.App.4th 129, 134-135.)

We also note that mother did not, and does not now, dispute that J.R. was the subject of a dependency proceeding or that the juvenile court terminated reunification services and parental rights as to that child. Indeed, mother's counsel elicited testimony from the social worker that mother's parental rights were terminated with regard to J.R. because mother was "falling asleep on the bus with [J.R.] and . . . she wasn't able to care for him on the bus," and was using drugs. And while mother testified as to her efforts to treat the problems that led to J.R.'s removal, the juvenile court resolved any conflicts in the evidence against her. Again, we do not second-guess the fact-finder's credibility

14

determinations or attempt to resolve conflicts in the evidence. (*In re Casey D., supra,* 70 Cal.App.4th at pp. 52-53; *In re James R., supra,* 176 Cal.App.4th at pp. 134-135.)

Mother claims the problems related to J.R.'s removal are distinct from her current problems, which she has made reasonable efforts to address. The record contradicts this claim. J.R. was removed due to mother's problems with substance abuse and failure to properly care for the child—falling asleep on the bus with the minor in her arms, nearly dropping him more than once. The minor was removed for the same reasons, namely that the minor tested positive for drugs at birth (meaning mother's substance abuse was still unresolved and ongoing) and was endangered when mother fell asleep in the hospital bed with the minor next to her, nearly smashing the minor's head with her arm. As with J.R., mother handled the minor roughly, struggled to obtain a stable living environment, and suffered from untreated or undertreated mental health issues. Any changes made by mother as to those issues were too recent to demonstrate longevity or to assure that the problems leading to J.R.'s removal had been adequately addressed.

Finally, mother claims the juvenile court failed to state a factual basis for its findings in favor of bypass and instead focused solely on whether mother met her burden to prove the best interests exception to the denial of services. We disagree.

As a preliminary matter, the juvenile court acknowledged the department's burden to show application of either subdivision (b)(10) or (11) of section 361.5, and the court's own duty to consider "the current efforts, fitness, and history, seriousness of the problem that led to the dependency, the strength of the parent-child relationship, and any bond, also, the child's need for stability and continuity," as well as the likelihood that reunification services will be successful.

Against that backdrop, the court found mother's ongoing drug use was serious and long-term, dating back to her teenage years, as were her mental health issues, which were diagnosed in 2005 or 2006. Along with those serious problems, unresolved issues

15

regarding housing and income, and failure to develop parenting skills (e.g., handling the child safely and appropriately) contributed to the removal of J.R.

After discussing at length mother's recent efforts to address the identified problems, the court adopted the findings in the disposition order, reiterating that the extent of mother's progress "was fair in that [mother] complied with random . . . drug testing, but was slow to start services," and "[t]here's no stable housing or suitable source of income for the child."

Accordingly, we conclude the juvenile court's bypass order is supported by substantial evidence.

## III.  DISPOSITION

The juvenile court's order is affirmed.


/S/

---
RENNER, J.


We concur:



/S/

---
HULL, Acting P. J.


/S/

---
MAURO, J.


16